**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Yesenia Galvan,<br><br>Plaintiff,<br><br>v.<br><br>City of Chicago, Deputy Chief Adnardo Gutierrez, Sgt. Anthony R. Strazzante, Sgt. James Kurth and Commander Melvin W. Branch,<br><br>Defendants. | Case No. 24-cv-3854 |

**CIVIL RIGHTS COMPLAINT**

NOW COMES Plaintiff Yesenia Galvan, by and through her undersigned counsel, James C. Vlahakis of Vlahakis Law Group LLC, and submits the following as her Civil Rights Complaint against Defendants City of Chicago, Deputy Chief Adnardo Gutierrez, Sgt. James Kurth, Sgt. Anthony R. Strazzante, and Commander Melvin W. Branch for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. ("Title VII"), including retaliation for Plaintiff engaging in protected activity, and for violations of the First Amendment:

**I. Parties, Jurisdiction and Venue**

1. Plaintiff Yesenia Galvan ("Plaintiff") is a citizen of the State of Illinois and is domiciled in the State of Illinois.

2. Plaintiff is employed as a Patrol Officer with the Chicago Police Department and was hired by the Department in December of 2018.

3. Defendant City of Chicago is a municipal entity responsible for the oversight and administration of the Chicago Police Department.

4. Defendant Deputy Chief Adnardo Gutierrez is employed by the City of Chicago and he is being sued in his individual capacity

5. Defendant Sgt. Anthony R. Strazzante is employed by the City of Chicago and he is being sued in his individual capacity

6. Defendant Sgt. James Kurth is employed by the City of Chicago and he is being sued in his individual capacity

7. Defendant Commander Melvin W. Branch is employed by the City of Chicago and he is being sued in his individual capacity

8. In this Civil Rights Complaint, Plaintiff asserts that Defendants violated her civil rights based upon her sex (female) and that Defendants engaged in various actions in retaliation for Plaintiff complaining about how she was mistreated based upon her sex.

9. Plaintiff engaged in protected activity on January 25, 2024, by reporting the discrimination and mistreatment that she suffered to the Equal Employment Opportunity Commission.

10. Plaintiff's Charge of Discrimination (440-2024-03684) was transmitted to, Maria Vuolo-Milan, Chicago Assistant Corporation Counsel for the City of Chicago.

11. After Defendant became aware of the fact that Plaintiff had reported the discrimination that she suffered to the EEOC, Defendant (by and through Plaintiff's superiors) retaliated against Plaintiff by subjecting her to further mistreatment and harassment.

12. Further, in this Civil Rights Complaint, Plaintiff also asserts that Defendants violated Title VII by retaliating against her for complaining about sex discrimination, and in particular, retaliating against her after she file a Charge of Discrimination with the EEOC.

13. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 by way of Title VII and 42 U.S.C. § 1983. Further, pursuant to 28 U.S.C. § 1367,

Supplemental jurisdiction exists with regard to Plaintiff's claims that certain Defendants violated the Illinois Whistleblower Act, 740 ILCS 174/15(b).

14. Venue is proper in this Judicial District because Plaintiff was employed in this Judicial District and suffered discrimination and retaliation within this Judicial District.

15. Further, in addition to Plaintiff residing in this Judicial District, upon in formation and belief, each of the individual Defendants residents in this Judicial District.

**II. Exhaustion of Administrative Remedies**

16. Plaintiff filed a timely Charge of Discrimination on February 7, 2024.

17. Plaintiff received a Determination and Notice of Rights letter from the EEOC (hereafter a "Right to Sue Letter") *within* the past 90 days.

18. Accordingly, this lawsuit was timely filed.

**III. Additional Allegations**

19. In September of 2023, Plaintiff was assigned/detailed to Area 4, Unit 214 of the 11th Police District.

20. In or around late September or early October of 2023, Police Officer Gladys De Leon was involved in a verbal altercation with Police Officer Reyna [last name unknown].

21. Deputy Chief Adnardo Gutierrez convened a meeting with certain employees from Unit 214 (including Plaintiff) and the certain employees of members from the 11th District to discuss the incident involving Police Officer De Leon and Police Officer Reyna.

22. Commander Davina F. Ward from the 11th District also attended this meeting.

23. During the meeting, Deputy Chief Gutierrez asked those in attendance for their opinions regarding the incident involving Police Officer De Leon Police Officer Reyna (where Officer Reyna was not at the meeting). In particular, Deputy Chief Gutierrez asked those in attendance to discuss the ongoing issues involving female patrol officers working for Unit 214 and the 11th District.

24. When Deputy Chief Gutierrez asked Plaintiff for her opinion, she responded by saying "I do not have problem with either side and that I look forward to working with everyone." She also said, "I'm not exactly sure what is going on but that maybe it was some miscommunication."

25. As discussed below, Plaintiff was ostracized for failing to side with either of the two officers involved in the verbal altercation – where the verbal altercation involved ongoing issues between female patrol officers working for Unit 214 and the 11th District.

26. Shortly after the above meeting took place, in early October of 2023, Plaintiff overheard Police Officer Ramona Robles telling a sergeant that she did not want to train Plaintiff to be trained for time-keeping purposes because she did not want Plaintiff "in my shit."

27. Because of what Police Officer Robles, Plaintiff was never trained to in time-keeping.

28. In late October or early November of 2023, Police Officer Gladys De Leon walked up to Plaintiff in a physically threatening manner and slammed papers on Plaintiff's desk,

29. The manner in which Officer De Leon approached Plaintiff caused Plaintiff to believe that Delon was going to strike her.

30. Immediately after Delon slammed the papers on Plaintiff's desk, she told Plaintiff, "this was due at the beginning of the period!"

31. Officer Delon was referring to the monthly Sgt. Management Requests when she made the above statement.

32. In mid to late December of 2023, Lt. Nicholas Duckhorn informed Plaintiff that he was assigning Police Officer Sylvia Rodriguez to observe Plaintiff at work.

33. When Plaintiff asked Lt. Duckhorn why Police Officer Rodriguez was observing her and what role Rodriguez would be tasked with, Duckhorn responded that Rodriguez would not be performing any tasks, *other than observing Plaintiff work*.

34. A few days later, Plaintiff was asked by Police Officer Robles sarcastically asked Plaintiff is she wanted to work for Commander Davina Ward.

35. Plaintiff was confused about why Police Officer Robles asked her if she wanted to work with wanted to work for Commander Ward.

36. In December of 2023, work related stress was causing Plaintiff to suffer from stress, anxiety, sleep issues and weight loss.

37. As a result of these work-related conditions, Plaintiff went to a medical professional and received a health screening. The results of the health screen were not favorable and this added to Plaintiff's work-related stress.

38. In or about January 3, 2024, as a result of work-related stress, Plaintiff asked to transfer from Unit 214, where her formal requests identified her long commute time and childcare issues.

39. Plaintiff's commute was being impacted by her assignment to Unit 214 – where the location of Unit 214 from her home resulted in a one-hour drive to work and

an approximately just over aone-hour drive home. These commute times negatively impacted the time Plaintiff could spend with your young child.

40. While Plaintiff's commute and child care issues were truly impacting her, she was too afraid to identify the other reasons she wanted a transfer from Unit 214.

41. These reasons are that she felt ostracized and harassed by other police department employees after she refused to take sides relative to the verbal altercation involving Officer De Leon and Reyna – where the verbal altercation involved issues involving female patrol officers working for Unit 214 and the 11th District.

42. On January 13, 2024, Plaintiff attended an office get together at which time Officer Robles told Plaintiff that she was unhappy with Plaintiff remaining neutral over the incident involving Officers De Leon and Reyna - where the verbal altercation involved issues involving female patrol officers working for Unit 214 and the 11th District

43. Because Plaintiff had remained neutral, Office Robles informed Plaintiff that she told Deputy Chief Adnardo Gutierrez that Plaintiff "gotta go" – meaning that Office Robles wanted Plaintiff transferred to a different Unit.

44. Duri9ng this conversation Office Robles also told Plaintiff that Deputy Chief Gutierrez responded to Robles' request by saying "maybe this will teach [Plaintiff] who side her loyalty is with."

45. In response to what Robles said, Plaintiff asked Robles why she was upset with her for remaining neutral.

46. Police Officer De Leon overheard Plaintiff and told Plaintiff, "If you're neutral, you're against us".

47. Immediately thereafter, Officer Robles told Plaintiff that she was surprised that she "had lasted this long"

48. Additionally, taunted Plaintiff and asked her if she was "going to quit."

49. As a result of this conversation, Plaintiff started to look for a different position with a different unit.

50. On January 23, 2024, Plaintiff met with Sergeant James Furth to report to him that she felt she was being ostracized and at work as a result of her not taking a side between the ongoing dispute involving Officers Robles and De Leon.

51. During this conversation, Plaintiff told Sergeant Furth that she was being ostracized and harassed by members of her unit as a result of her taking a neutral position relative to the verbal dispute involving Officers Robles and De Leon.

52. After Plaintiff discussed the above issues with Sergeant Furth, she had a telephone conversation with Lt. Duckhorn and explained to him that she was being ostracized and harassed by members of her unit as a result of her taking a neutral position relative to the verbal dispute involving Officers Robles and De Leon.

53. Next, Plaintiff spoke face-to-face with Deputy Chief Gutierrez and told him she was being ostracized and harassed by members of her unit as a result of her taking a neutral position relative to the verbal dispute involving Officers Robles and De Leon.

54. In particular, Plaintiff detailed the conversation that she had on January 13, 2024, with Officers Robles and De Leon where they both told Plaintiff that they were unhappy with Plaintiff remaining neutral with regard to the verbal incident involving Officers De Leon and Reyna.

55. Deputy Chief Gutierrez downplayed Plaintiff's concerns and sarcastically stated that this is just what happens in an all women environment and that Plaintiff should get used to it.

56. Deputy Chief Gutierrez then said, “are you going to let them win?” in a tone that suggested that he was attempting to cause a negative reaction from Plaintiff.

57. Plaintiff responded by saying, “I just want to remain professional.”

58. Deputy Chief Gutierrez also told Plaintiff that he was disappointed that she had allowed the comments of Officers Robles and De Leon to “get to you”.

59. After listening to Deputy Chief Gutierrez, Plaintiff asked him if she could transfer to the 007th District to get away from the harassment she was facing.

60. Deputy Chief Gutierrez agreed to transfer Plaintiff back to the 007th District.

61. Thereafter, Plaintiff prepared a letter documenting her transfer request and Deputy Chief Gutierrez signed and formally approved Plaintiff’s transfer request.

62. Plaintiff presented this letter (dated January 23, 2024) to Deputy Chief Gutierrez and he signed it under the word “APPROVED”.

63. Despite granting Plaintiff’s transfer request, on January 25, 2024, Deputy Chief Gutierrez convened a staff meeting at which time he told everyone in attendance that Plaintiff’s complaint about harassment and being ostracized as a result of her taking a neutral position regarding the incident between Officers Robles and De Leon should never have been brought to his attention.

64. As discussed below, Deputy Chief Guttierez rescinded Plaintiff’s request to transfer to the 007th District and dismissively called Plaintiff “soft” for seeking an assignment. In making this statement, Deputy Chief Guttierez implied that Plaintiff was being “soft” because she was a woman.

65. As a result of what Deputy Chief Gutierrez, Officer De Leon realized that Plaintiff had reported her to Deputy Chief Gutierrez and began to yell at Plaintiff.

66. After Officer De Leon began to yell at Plaintiff, Deputy Chief Gutierrez walked away, implying that he did not want to instruct Officer De Leon to calm down.

67. Seargent Kurt instructed Plaintiff as well as Officers De Leon, Robles and Lydia Abernathy to go into a room to discuss the situation.

68. During the ensuring discussion, Officers De Leon, Robles and Abernathy denied that Officers De Leon and Robles had made threating statements to Plaintiff during January 13, 2024, get together – as detailed above in Paragraph ___.

69. After this meeting concluded, Plaintiff was asked to visit Deputy Chief Gutierrez in his office. When Plaintiff met with Deputy Chief Gutierrez, he yelled at her for signing his name to the cover letter that Plaintiff prepared in conjunction with the approval letter that Deputy Chief Gutierrez had actually signed with his own hand.

70. Plaintiff was confused why Deputy Chief Gutierrez was yelling at her, because it was common place for her department and unit to sign certain documents on behalf of superiors – once the superior had authorized the employee to sign his or her name – or as was the case here – Plaintiff merely signed Deputy Chief Gutierrez's name on a cover letter – *after* Deputy Chief Gutierrez had already signed the transfer letter.

71. Deputy Chief Gutierrez also put Plaintiff down by telling her that she was "soft for letting the girls get to you" and told her that her complaint about being harassed and ostracized never should have gotten to him.

72. Deputy Chief Gutierrez repeated the above words several times.

73. Next, Deputy Chief Gutierrez angrily told Plaintiff that he had rescinded her transfer to the 007th District.

74. Plaintiff was devastated to hear this news, as she found that the ostracization and harassment she had suffered was intolerable.

75. Desperate to obtain a transfer to another District, Plaintiff asked Deputy Chief Gutierrez if she could be transferred to the 003rd District – despite knowing that this transfer would cause her to lose her administrative position and possibly return to patrol work in a high-crime area.

76. Deputy Chief Gutierrez agreed to transfer Plaintiff to the 003rd District, but in agreeing to Plaintiff's request, he reminded her that she was "soft for letting a bunch of girls get to her" and implied that she needed to act more like a man.

77. When Plaintiff returned to her home at the end of her shift on January 25, 2024, she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

78. As noted above, prior to returning to the 3rd District, Plaintiff was told that she would be assigned to the second watch upon her transfer to the 007th District.

79. However, in retaliation for Plaintiff complaining about sex discrimination, Plaintiff learned that Defendant Commander Melvin Branch and/or Defendant Sgt. James Kurth (at the direction of Deputy Chief Gutierrez or someone designated by him) assigned Plaintiff to third watch as a form of punishment for complaining about how other officers in her prior unit had been ostracizing and harassing her.

80. Plaintiff returned to the 3rd District effective February 1, 2024.

81. In retaliation for complaining about workplace harassment and retaliation, after returning to the 003rd District, Plaintiff's workhours were changed – where she was reassigned from the second watch (which involved working from 6:00 am to 2:30 pm or from 7:00 a.m. to 3:30 pm) to the third watch - which involved working from 1:00 to 10:30 pm – a less desirable time period.

82. This unlawful and retaliatory transfer was initiated by Commander Melvin W. Branch at the direction of Deputy Chief Adnardo Gutierrez.

83. The third watch is a less desirable time-slot because it resulted in Plaintiff being unable to see her young child during the daytime hours.

84. In January of 2024, Sgt. Kurth, in conjunction with Deputy Chief Adnardo Gutierrez and Daniel O'Brien (a so-called P0lice Legal Office II") initiated a bonus Internal Affairs investigation against Plaintiff where he falsely claimed that Plaintiff had "forged Deputy Chief Adnardo Gutierrez's signature to a To-From Subject Report on her own 'Detail Request', without permission to do so."

85. On or about February 2, 2024, Plaintiff filed Log Investigation No. 2024-0002210 to document the mistreatment she has suffered at the direction of Deputy Chief Adnardo Gutierrez and others.

86. On or about February 7, 2024, a Log Investigation No. 2024-0002383 was opened to document the Plaintiff being assigned to the third watch, as a result of her complaining about how Deputy Chief Gutierrez, Sgt. Anthony R. Strazzante and Sgt. Kurth had retaliated against her.

87. On February 7, 2024, digitally signed a formal charge of discrimination with the EEOC.

88. On March 8, 2024, Sgt. Strazzante interviewed Plaintiff in relation to Log Investigation No. 2024-0002383.

89. On May 7, 2024, in retaliation for Plaintiff initiating Log Investigation Nos. 2024-0002210 and 2024-0002383, Sgt. Strazzante initiated a bonus Internal Affairs investigation against Plaintiff where he falsely claimed that Plaintiff filed Log Investigation No. 2024-0002186 "in retaliation for department members initiating Log Investigation No. 2024-0002186."

90. As a result of the discrimination and mistreatment that Plaintiff suffered, she developed seborrheic dermatitis, a skin condition that was diagnosed as being related workplace stress and anxiety.

91. Chicago Police Department Employee Resource E01-01 prohibits retaliation against employees who raise internal or external charge of complaints of employment discrimination:

> City and Department policies specifically **prohibit any form of retaliation against an employee for making or filing internal or external charges** or complaints of employment discrimination or for cooperating with any internal investigation or mediation of a complaint. Retaliation includes adverse employment actions taken against an individual in whole or in part because that person either filed a charge of discrimination or participated in the investigation or mediation of that charge.

E01-01, III Policy, subpart A (emphasis in original).

92. Chicago Police Department Employee Resource E01-01 defines harassment as follows:

> **Harassment** includes conduct that has the purpose or effect of substantially interfering with the work performance of an employee or creating an intimidating, hostile, or offensive work environment. Harassment includes, but is not limited to, offensive statements, gestures, or physical contact; graffiti or offensive written materials; using Department communication systems and computers to send or receive offensive statements, graffiti, pictures, or other offensive materials; and other methods of creating a hostile work environment. The City and the Department prohibit all forms of harassment, including sexual harassment.

93. Chicago Police Department Employee Resource E01-01 explains that "the Department's Equal Employment Opportunity (EEO) policy" provides protections to employees that accede the protections afforded by other laws:

> **The EEO policies of the City and the Department are more comprehensive than state or federal law. Conduct that does not violate state or federal law may violate these policies** and may subject an employee to discipline, up to and including discharge. Therefore, conduct that violates this policy may, or may not, also violate federal or state law, and a finding that an employee has violated this policy is not necessarily a finding that the employee also violated state or federal law.

E01-01, III Policy, subpart D (emphasis in original).

94. Chicago Police Department Employee Resource E01-01, Section IV explains (in relevant part) that police department employees are entitled to bring complaints of discrimination without being subjected retaliation:

> Department employees *and* *employees of third-party contractors working at Department facilities* are entitled to bring complaints of employment discrimination to such agencies, to bring internal complaints within the Department as described in Item III-B, or both. No provision of this directive shall be construed to prevent any Department member from seeking legal remedy outside the Department.

E01-01, IV Equal Employment Opportunity Complaints, subpart A (emphasis in original).

95. Chicago Police Department General Order G08-05, Section III-B (Policy) provides that the "Department prohibits and does not tolerate any abuse of law enforcement authority by its members."

96. The above named individual Defendants violated General Order G08-05, Section III-B because they abused their law enforcement authority when they retaliated against Plaintiff for exercising her right to complain about sex discrimination and retaliation resulting from her complaints about sex discrimination.

97. Further, General Order G08-05, Section III-E "strictly prohibits its members from":

> 1. engaging in any form of retaliation against Department members or members of the public, as defined by the law or this directive or
>
> 2. enlisting or directing any other Department member to engage in any form of retaliation against Department members or members of the public, as defined by the law or this directive[.]

General Order G08-05, Section III-E.

98. General Order G08-05, Section III-F defines "retaliation" as "any conduct, action, or inaction of a damaging, intimidating, or threatening nature, or any interference, intimidation, coercion, or other adverse action taken against any

individual designed to serve as retribution that is intended to punish, cause harm or emotional stress, or improperly influence the individual's actions.

99. The above named individual Defendants violated General Order G08-05, Section III-E because they retaliated against Plaintiff for exercising her right to complain about sex discrimination and retaliation resulting from her complaints about sex discrimination.

100. Further, General Order G08-05, Section III-H(1)(a) specifically "prohibits" department employees from retaliating against fellow employees who are "engaging in protected lawful exercise of First Amendment rights (e.g., protected speech, lawful demonstrations, observing or filming police activity, or criticizing the Department, a Department member, or a member's conduct)."

101. The above named individual Defendants violated General Order G08-05, Section III-H(1)(1) because they retaliated against Plaintiff for exercising her right to complain about sex discrimination and retaliation resulting from her complaints about sex discrimination.

102. Additionally, General Order G08-05, Section III-H(1)(b) specifically "prohibits" employees from retaliating against fellow employee for "filing a complaint, reporting an allegation of misconduct, or providing information regarding alleged misconduct."

103. The above named individual Defendants violated General Order G08-05, Section III-H(1)(b) because they retaliated against Plaintiff for exercising her right to complain about sex discrimination and retaliation resulting from her complaints about sex discrimination.

104. Plaintiff is not alone in how she was subjected to sex discrimination and retaliation. For example, a former ranking police officer named Aileen Robinson, recently filed suit against the City of Chicago by raising the following allegations:

1. Aileen Robinson has dedicated her professional life to helping victims of crime, domestic violence, and sexual misconduct. She does so primarily through her role as the assistant director for crime victim services for the City of Chicago Police Department where she has dedicated the last 24 years of her career. She is the most senior civilian law enforcement professional on the leadership team in Community Policing, and at the time of the incidents at issue she was the only woman on the senior leadership team for the Office of Community Policing.

2. It is now Ms. Robinson who is the victim of harassment, intimidation, and retaliation by the Chicago Police Department itself.

3. In 2022, Robinson became both a target and witness of harassment by high-ranking officials within the police department. The work environment included scores of inappropriate and offensive incidents including male counterparts forcibly grabbing Ms. Robinson by the arm, high-ranking officials referring to a female secretary as the "bitch" in open staff meetings, cat-calling women in the department as "sexy," inappropriately hovering around the desks of women and leering at them, using public workspaces to strip down and change clothes in front of women.

4. Robinson committed the cardinal sin at the police department of complaining about these acts and speaking out about the environment. Shortly after she complained, one senior police department official aggressively grabbed Robinson and threatened Robinson telling her "this is not an EEOC complaint."

5. Robinson, however, would not be silenced and she submitted complaints about the toxic work environment and spoke about it publicly. In May 2022, the Chicago Sun-Times published an article about the hostile work environment, CPD Supervisors Reassigned Following Claims They Fostered Hostile Work Environment, in which she provided information about the hostile work environment.

6. Rather than addressing the hostile work environment, the Chicago Police Department turned its attention and ire on Robinson and repeatedly retaliated against her. After her complaints and the Sun-Times article, the department opened a year-long internal affairs investigation of Robinson's conduct. She was subjected to internal affairs questioning and a three-week unpaid suspension to silence her and others like her for speaking up about their experiences within the Police Department. The retaliatory punishment imposed by internal affairs was unprecedented, opposed by the peer�review board, and a violation of Robinson's rights to free speech.

7. In addition, the Department retaliated against Robinson by blackballing her from other career opportunities, denying her basic safety requests, yelling at her in public, increasing her workload, attempting to relocate her office to a storage closet, denying her parking privileges, and otherwise sabotaging her ability to work in a professional and safe environment.

***

13. The work environment at the Chicago Police Department is, at times, an old boys club, and at other times, more akin to a fraternity house. Robinson endured the environment for years. In 2022, she made the mistake of submitting official complaints of such conduct and speaking out about the work environment.

14. For example, in early 2022, Robinson attended a department meeting and witnessed one high ranking official of the Police Department publicly refer to a female secretary as the "bitch."

15. This same high-ranking official of the department also called women "sexy" when walking by them in the hallways or made other similarly inappropriate comments in the workplace.

16. Acts of this nature were so prevalent, and officials so emboldened, that another male official used the public area cubicles to disrobe and change clothes without regard to the women in the area.

17. After Robinson (and others) complained about the environment, things quickly turned worse for her. In April 2022, a police department official physically grabbed Robinson around the arm during a staff meeting to silence her from speaking. Robinson shook her arm free, telling the official not to touch her like that. The male official looked straight at Robinson, warning her: "This is not an EEOC complaint."

18. Robinson reported the incidents and further raised her concerns about the increasingly hostile environment to the Chief of Police and Director. Despite her complaint, the department failed to act. In fact, it got worse as the department turned against Robinson.

19. Shortly after complaining about the inappropriate actions of the Commander—and shortly after the Commander was made aware of the complaint against him—Robinson received an email invitation from him requesting that she attend a "Coffee with the Commander" meeting. When Robinson inquired about the purpose of the meeting, she was simply told that she need not attend.

20. The next day, on or about April 28, Robinson went to the Commander's office to brief him on a domestic violence homicide. As she walked toward his office he stood up, took a tactical stance, and screamed at her to talk to someone else about the issue.

21. Robinson reported this behavior and informed the Department that she did not feel safe. Indeed, she began suffering from panic attacks, lost her hair, and suffered additional physical and mental issues that resulted in her needing medical care and medication. Her panic attacks were so severe that on April 30, 2022—after seeing the Captain's car parked in front of the building—she was unable to get out of her own car to go into the office. After a time, she walked into the building, went to her office, and broke down crying in another panic attack.

22. Her medical providers informed her that she should not return to the Police Department until her safety concerns were addressed.

23. Robinson took administrative leave of absence beginning on May 2, 2022, which continued until May 6 at which time the Department directed her to return to work. The Department promised that it had removed both the Commander and Captain from the building and, to the extent either of them needed to come to the building, the department would provide advance notice to Robinson.

***

26. Robinson faced additional and repeated workplace retaliation. By way of example, the department once tried to relocate her office into storage facility; it refused to provide her a parking space even though she outranked others that received parking spaces; officials demeaned her and increased her workload; and officials blackballed her from other job opportunities within the City of Chicago despite her qualifications for those opportunities.

27. In the Spring of 2022, the Chicago Sun-Times was investigating the hostile work environment at the Police Department. As part of its investigation, its investigative journalist spoke with Robinson about her own experiences within the department.

28. Robinson agreed to share some of her experiences, but she feared further retaliation and spoke to the Sun-Times on condition of anonymity. On May 12, 2022, the Sun-Times published an article about the hostile work environment within the Chicago Police Department.

29. Robinson's comments regarding her experiences as a victim at the police department are a matter of public concern.

30. Rather than address the hostile work environment, the Police Department retaliated against Robinson in a further effort to muzzle her, and others like her in the future. It opened an investigation into Robinson and directed her to keep quiet about the work environment—she was not to speak with anyone about her situation while the Department investigated the publication of the article.

> 31. As part of that investigation, Internal Affairs summoned her to their offices for an interview in which they badgered her about speaking with the Sun-Times. Robinson expressed her belief that the department was retaliating against her, but the department persisted and required her to sit for an interview. Robinson emphasized that she was the victim in this case and that she should not be silenced or otherwise prevented from talking about what happened to her.
>
> 32. On August 9, 2023, after a year-long Internal Affairs investigation, Yolanda Talley, the Chief of Internal Affairs for the Chicago Police Department, issued discipline to Robinson for her protected actions in speaking to the press.
>
> 33. Specifically, Robinson received an unprecedented 21-day suspension without pay. Other employees who committed far more serious and dangerous rule violations were treated more favorably.

*See, Aileen Robinson v. The City of Chicago, et al.*, Case No. 2024-cv-3329 (Dkt. 1, Complaint).

105. Similarly, Allison Schloss, a former Chicago Police Officer, has recently asserted that she was subjected to discrimination based upon her gender, where she has asserted the following acts of discrimination in a lawsuit she filed:

> 4. Plaintiff is a retired female sworn officer of the Chicago Police Department who held the rank of lieutenant for 17 years. In May 2014, she was promoted by former Superintendent Garry McCarthy and served as the first (and only) female commanding officer of the Marine and Helicopter Unit until June 2016, when she was removed from her command—because of her sex.
>
> 5. While in command of the Marine and Helicopter Unit, Plaintiff was targeted for harassment and discrimination by Steve E. Georgas, the acting deputy chief and later deputy chief of CPD's Special Functions Division. The Special Functions Division ("Special Functions") includes the Marine and Helicopter Unit, the Bomb Squad, the Special Weapons and Tactics (SWAT) Team, and other high-profile operations from which women have been—and continue to be—largely excluded from employment.
>
> 6. The number of women employed in Special Functions during Deputy Chief Georgas' command was abysmal—and remains so today.
>
> ***
>
> 9. Deputy Chief Georgas permitted, modeled, and fueled gender-based resistance to Plaintiff's command by her male subordinate officers. He scapegoated her, harassed her, humiliated her, and intentionally undermined her command.

10. On May 31, 2016, Georges terminated Plaintiff's command of the Marine Unit, because of her sex.

11. On June 7, 2016, at approximately 2:15 p.m., Plaintiff filed an internal workplace discrimination complaint with the Office of Legal Affairs, asserting that she had been subjected to unlawful sex discrimination. Specifically, Plaintiff complained that Georgas had imposed unwarranted discipline upon her, including terminating her command of the Marine Unit, because of her sex, in violation of CPD workplace policy and Title VII.

12. Less than two hours later, Georgas conducted a meeting of Marine Unit supervisors, all of them male, after telling Plaintiff not to attend. Defendants Fitzsimmons, Romero, Hadju, and Harnish were present at the meeting. Together, Defendants conspired to have a spurious sexual harassment complaint filed against Plaintiff, to create a pretext for removing her from command.

13. On June 8, 2016, Georgas terminated Plaintiff's command of the Helicopter Unit, because of her sex and in retaliation for the sex discrimination complaint she filed on June 7.

14. Georgas was assigned to Detached Services effective September 1, 2016 and no longer serves as deputy chief of Special Functions.

*See, Allison Schloss v. The City of Chicago, et al.*, Case No. 2018-cv-3329 (Dkt. 95, Second Amended Complaint).

106. Plaintiff is also aware of how the Chicago Police Department, and in particular how the Bureau of Internal Affairs has retaliated against other female employees and just like these other female employees, Plaintiff has been subject to sex discrimination and retaliation for speaking out against her mistreatment.

107. Just like other female employees, Plaintiff was subjected to a retaliatory Bureau of Internal Affairs investigation after she complained about sex discrimination.

108. Further, just like other female employees, Plaintiff was subjected to a retaliatory Bureau of Internal Affairs investigation after she filed a charge of discrimination with the EEOC.

109. The City of Chicago's hostility and disregard for the equal treatment of female police officers is too pervasive to be unintended.

110. Both alone and together, the above examples demonstrate that the City of Chicago has allowed male police officials in positions of authority to intentionally deter and prevent fully qualified women from enjoying equal employment opportunities to work for the Chicago Police Department.

111. Further, as demonstrated above and in this Civil Rights Complaint, male members of the Bureau of Internal Affairs routinely abuse their positions of authority and power by raising specious and retaliation complaints against female police officer who dare to raise complaints regarding their mistreatment and the impact of pervasive sex discrimination and bullying based upon gender.

112. The above-described acts demonstrate a pattern, practice, and custom of intentional sex discrimination against female police department employees.

113. The above-described acts demonstrate a pattern, practice, and custom of other employees of the Chicago Police Department engaging in acts of retaliation against female police department employees who dare to complain about sex discrimination.

**Count I – Violations of Title VII**

**Sex and Gender Discrimination and Adverse Treatment**

114. Plaintiff reasserts and realleges Paragraphs 113 in this Count as if fully stated.

115. Through the actions described above, the City of Chiago intentionally discriminated against Plaintiff based upon her sex by subjecting her to discrimination and adverse treatment in the form of a retaliatory transfer for a less favorable job position, as well as subjecting Plaintiff to retaliatory Internal Affairs Complaints.

116. As a direct and proximate result of this unlawful conduct and disregard for Plaintiff's federally protected rights and dignity, Plaintiff has lost and will continue

to suffer damages, such as mental anguish and humiliation as well as anxiety, and loss of income and benefits. Further, Plaintiff has suffered reputational harm as a result of the above outlined misconduct.

WHEREFORE, Plaintiff seeks the following relief against Defendant City of Chicago:

a. Declaratory relief – in the form of a declaration from this Court that one or all of the Defendants violated Plaintiff's rights as provided by Title VII;

b. Compensatory damages;

c. Compensation for emotional distress;

d. Punitive damages; and

e. Legal fees and costs.

**Count II – Violations of Title VII**

**Based Upon Unlawful Retaliation in Response to Plaintiff Raising Complaints About Discriminatory Treatment**

117. Plaintiff reasserts and realleges Paragraphs 113 in this Count as if fully stated.

118. Title VII of the Civil Rights Act of 1964, as amended, prohibits retaliation for an employee's complaints about what they reasonably perceive as discrimination in the workplace.

119. As set forth above, Plaintiff engaged in protected conduct but was subjected unlawful retaliation by the Defendants.

120. The Defendants willfully and improperly denied Plaintiff equal job terms and workplace conditions in direct retaliation because of her complaints and objections about sex discrimination and the creation of a hostile work environment.

121. As a direct and proximate result of this unlawful conduct and disregard for Plaintiff's federally protected rights and dignity, Plaintiff has lost and will continue

to suffer damages, such as mental anguish and humiliation as well as anxiety, and loss of income and benefits. Further, Plaintiff has suffered reputational harm as a result of the above outlined misconduct.

WHEREFORE, Plaintiff seeks the following relief against Defendant City of Chicago:

a. Declaratory relief – in the form of a declaration from this Court that one or all of the Defendants violated Plaintiff's rights as provided by Title VII;

b. Compensatory damages;

c. Compensation for emotional distress;

d. Punitive damages; and

e. Legal fees and costs.

**Count III – Violations of Title VII Based**

**Upon Unlawful Retaliation in Response to Plaintiff Filing a Charge of Discrimination With the EEOC**

122. Plaintiff reasserts and realleges Paragraphs 113 in this Count as if fully stated.

123. Title VII of the Civil Rights Act of 1964, as amended, prohibits retaliation for an employee's complaints about what they reasonably perceive as discrimination in the workplace.

124. As set forth above, Plaintiff engaged in protected conduct but was subjected unlawful retaliation by the Defendants.

125. The Defendants willfully and improperly denied Plaintiff equal job terms and workplace conditions in direct retaliation because of her complaints and objections about sex discrimination and the creation of a hostile work environment.

126. As a direct and proximate result of this unlawful conduct and disregard for Plaintiff's federally protected rights and dignity, Plaintiff has lost and will continue

to suffer damages, such as mental anguish and humiliation as well as anxiety, and loss of income and benefits. Further, Plaintiff has suffered reputational harm as a result of the above outlined misconduct.

WHEREFORE, Plaintiff seeks the following relief against Defendant City of Chicago:

a. Declaratory relief – in the form of a declaration from this Court that one or all of the Defendants violated Plaintiff's rights as provided by Title VII;

b. Compensatory damages;

c. Compensation for emotional distress;

d. Punitive damages; and

e. Legal fees and costs.

**Count IV – Violations of the First Amendment Against the Individual Defendants**

127. Plaintiff reasserts and realleges Paragraphs 113 in this Count as if fully stated.

128. As set forth above, Plaintiff engaged in protected speech that is protected by the First Amendment as it involved a matter of public concern.

129. As a result of invoking her First Amendment Rights, Plaintiff was subjected to the above-described forms of unlawful retaliation by Defendants.

130. The Defendants willfully and improperly denied Plaintiff equal job terms and workplace conditions in direct retaliation because of her complaints of mistreatment as a result of her gender.

131. As a direct and proximate result of this unlawful conduct and disregard for Plaintiff's federally protected rights and dignity, Plaintiff has lost and will continue to suffer damages, such as mental anguish and humiliation as well as anxiety, and

loss of income and benefits. Further, Plaintiff has suffered reputational harm as a result of the above outlined misconduct.

WHEREFORE, Plaintiff seeks the following relief against Defendants Deputy Chief Adnardo Gutierrez, Sgt. Anthony R. Strazzante, Sgt. Jame Kurth and Commander Melvin W. Branch:

a. Declaratory relief – in the form of a declaration from this Court that one or all of the Defendants violated Plaintiff's rights as provided by the First Amendment;

b. Compensatory damages;

c. Compensation for emotional distress;

d. Punitive damages; and

e. Legal fees and costs.

**Count V – *Monell* Claim for Sex Discrimination**

132. Plaintiff reasserts and realleges Paragraphs 113 in this Count as if fully stated.

133. As described above, the examples of sexual discrimination suffered by Plaintiff and other female officers is so widespread and well-settled as to constitute a standard operating procedure of the City of Chicago and constitutes a formal policy of sex discrimination with the unfortunate force of law.

134. As a direct and proximate result of this unlawful conduct and disregard for Plaintiff's federally protected rights and dignity, Plaintiff has lost and will continue to suffer damages, such as mental anguish and humiliation as well as anxiety, and loss of income and benefits. Further, Plaintiff has suffered reputational harm as a result of the above outlined misconduct.

WHEREFORE, Plaintiff seeks the following relief against Defendant City of Chicago:

a. Declaratory relief – in the form of a declaration from this Court that one or all of the Defendants violated Plaintiff's rights as provided by law;

b. Compensatory damages;

c. Compensation for emotional distress;

d. Punitive damages; and

e. Legal fees and costs.

**Count VI – *Monell* Claim**

**The City of Chicago Has Engaged in a Widespread Pattern and Practice of Retaliation Where Female Officers Have Internally Complained About Sex Discrimination**

135. Plaintiff reasserts and realleges Paragraphs 113 in this Count as if fully stated.

136. As described above, the City of Chicago has allowed Plaintiff and other female officers to be retaliated against after raising internal complaints of sex discrimination. The retaliation suffered by plaintiff and other female offices is so widespread and well-settled as to constitute a standard operating procedure of the City of Chicago and constitutes a formal policy of sex discrimination with the unfortunate force of law.

137. As a direct and proximate result of this unlawful conduct and disregard for Plaintiff's federally protected rights and dignity, Plaintiff has lost and will continue to suffer damages, such as mental anguish and humiliation as well as anxiety, and loss of income and benefits. Further, Plaintiff has suffered reputational harm as a result of the above outlined misconduct.

WHEREFORE, Plaintiff seeks the following relief against Defendant City of Chicago:

a. Declaratory relief – in the form of a declaration from this Court that one or all of the Defendants violated Plaintiff's rights as provided by law;

b. Compensatory damages;

c. Compensation for emotional distress;

d. Punitive damages; and

e. Legal fees and costs.

**Count VII – *Monell* Claim**

**The City Has Engaged in a Widespread Pattern and Practice of Retaliation Where Female Officers Have Filed Charges of Discrimination With the EEOC**

138. Plaintiff reasserts and realleges Paragraphs 113 in this Count as if fully stated.

139. As described above, the City of Chicago has allowed Plaintiff and other female officers to be retaliated against after raising external complaints of sex discrimination to the EEOC The retaliation suffered by plaintiff and other female offices is so widespread and well-settled as to constitute a standard operating procedure of the City of Chicago and constitutes a formal policy of sex discrimination with the unfortunate force of law.

140. As a direct and proximate result of this unlawful conduct and disregard for Plaintiff's federally protected rights and dignity, Plaintiff has lost and will continue to suffer damages, such as mental anguish and humiliation as well as anxiety, and loss of income and benefits. Further, Plaintiff has suffered reputational harm as a result of the above outlined misconduct.

WHEREFORE, Plaintiff seeks the following relief against Defendant City of Chicago:

a. Declaratory relief – in the form of a declaration from this Court that one or all of the Defendants violated Plaintiff's rights as provided by law;

b. Compensatory damages;

c. Compensation for emotional distress;

d. Punitive damages; and

e. Legal fees and costs.

**Count VIII**

**Denial of Equal Protection Under the Law vs. the Individual Defendants**

141. Plaintiff reasserts and realleges Paragraphs 113 in this Count as if fully stated.

142. The actions of Defendants Deputy Chief Adnardo Gutierrez, Sgt. Anthony R. Strazzante, and Commander Melvin W. Branch have denied Plaintiff equal protection of the law.

143. As a direct and proximate result of this unlawful conduct and disregard for Plaintiff's federally protected rights and dignity, Plaintiff has lost and will continue to suffer damages, such as mental anguish and humiliation as well as anxiety, and loss of income and benefits. Further, Plaintiff has suffered reputational harm as a result of the above outlined misconduct.

WHEREFORE, Plaintiff seeks the following relief against Defendants Deputy Chief Adnardo Gutierrez, Sgt. Anthony R. Strazzante, Sgt. Jame Kurth and Commander Melvin W. Branch Defendant:

a. Declaratory relief – in the form of a declaration from this Court that one or all of the Defendants violated Plaintiff's rights to equal protection;

b. Compensatory damages;

c. Compensation for emotional distress;

d. Punitive damages; and

e. Legal fees and costs.

**Count IX**

**Violations of the Illinois Whistle Blower Act ("IWA") Against All Defendants**

144. Plaintiff reasserts and realleges Paragraphs 113 in this Count as if fully stated.

145. The IWA was created "to protect employees from adverse employment actions in retaliation for reporting or refusing to engage in unlawful conduct by their employers." *Huang v. Fluidmesh Networks, LLC*, 2017 WL 3034672, *3 (N.D. Ill. July 18, 2017) (emphasis added).

146. "[T]he purpose of the Whistleblower Act is to protect statutorily defined employees who report violations of state or federal laws, rules, or regulations 'because the reported wrongful conduct or unsafe condition affected the health, safety[,] or welfare of Illinois residents as a whole.' " *Larsen v. Provena Hospitals*, 2015 IL App (4th) 140255, ¶ 47 (quoting *Sutherland v. Norfolk Southern Ry. Co.*, 356 Ill. App. 3d 620, 627 (2005)).

147. Section 15(b) of the IWA prohibits an employer from retaliating against an employee who discloses information to a government agency that the employee reasonably believes is a violation of any federal or state law, rule or regulation.

148. Section 20.1 of the IWA makes it unlawful for officials to take materially adverse against an employee because of the employee's disclosure or attempt to disclose matter of involving a public concern.

149. Plaintiff's complaints of discrimination, mistreatment and retaliation to the EEOC constitute matters of public concern.

150. As described above, each of the Defendants violated Section 15(b) and Section 20.1 of the Whistle Blower Act in response to Plaintiff complaining about sex discrimination and retaliation to the EEOC.

151. As described above, Defendants Deputy Chief Adnardo Gutierrez, Sgt. Anthony R. Strazzante, and Commander Melvin W. Branch violated Section 15(b) of the Whistle Blower Act in response to Plaintiff complaining about sex discrimination to the EEOC.

152. As a direct and proximate result of this unlawful conduct and disregard for Plaintiff's federally protected rights and dignity by Defendants Deputy Chief Adnardo Gutierrez, Sgt. Anthony R. Strazzante, and Commander Melvin W. Branch, Plaintiff has lost and will continue to suffer damages, such as mental anguish and humiliation as well as anxiety, and loss of income and benefits. Further, Plaintiff has suffered reputational harm as a result of the above outlined misconduct.

WHEREFORE, Plaintiff seeks the following relief against all of the Defendants:

a. Declaratory relief – in the form of a declaration from this Court that one or all of the Defendants violated Plaintiff's rights as provided by the IWA;

b. Compensatory damages;

c. Compensation for emotional distress;

d. Punitive damages; and

e. Legal fees and costs.

**Count X**

**Defamation Against Defendants Gutierrez and Strazzante**

153. Plaintiff reasserts and realleges Paragraphs 113 in this Count as if fully stated.

154. Defendants Deputy Chief Adnardo Gutierrez and Sgt. Anthony R. Strazzante, defamed Plaintiff by falsely claiming that she falsified Defendant Gutierrez's signature on the cover letter of Plaintiff's transfer request and by causing this false charge to be communicated to people employed by the Chicago Police Department.

155. As of the actions of Defendants Gutierrez and Strazzante, Plaintiff has lost and will continue to suffer damages, such as mental anguish and humiliation as well as anxiety, and loss of income and benefits. Further, Plaintiff has suffered reputational harm as a result of the above outlined misconduct.

WHEREFORE, Plaintiff seeks the following relief against Defendants Deputy Chief Adnardo Gutierrez and Sgt. Anthony R. Strazzante:

a. Declaratory relief – in the form of a declaration from this Court that one or all of the Defendants Gutierrez and Strazzante defamed Plaintiff;

b. Compensatory damages;

c. Compensation for emotional distress;

d. Punitive damages; and

e. Legal fees and costs.

**Jury Demand**

Plaintiff demands a jury trial for all applicable causes of action.

Respectfully submitted,

/s/ James C. Vlahakis
James C. Vlahakis
**Vlahakis Law Group LLC**
20 N. Clark Street, Suite 3300
Chicago IL 60602
jamesv@vlahakislaw.com
312-766-0511

*Counsel for Plaintiff*