UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

YESENIA GALVAN,

        Plaintiff,

    v.

CITY OF CHICAGO, DEPUTY CHIEF
ADNARDO GUTIERREZ, SGT. ANTHONY R.
STRAZZANTE, SGT. JAMES KURTH, AND
COMMANDER MELVIN W. BRANCH,

        Defendants.

No. 24 CV 3854

Judge Georgia N. Alexakis

MEMORANDUM OPINION AND ORDER

Plaintiff Yesenia Galvan, a woman, is a patrol officer with the Chicago Police Department ("the Department"). She alleges that she became unwillingly embroiled in an interpersonal dispute between coworkers after transferring to a new unit and that, as a result, she was discriminated against on the basis of her sex and then retaliated against for reporting that discrimination. In May 2024, Galvan sued the City of Chicago ("the City") and several individual officers (collectively "the defendants"), alleging that her treatment violated Title VII of the Civil Rights Act of 1964, the Equal Protection Clause of the Fourteenth Amendment, *see* 42 U.S.C. § 1983, and Illinois whistleblower and defamation laws.

The defendants now move to dismiss the complaint. [39]. For the following reasons, that motion is granted.

## I. Legal Standards

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court must accept the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor (as the Court does in the section that follows), but it need not accept legal conclusions or "threadbare recitals" supported by "mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II. Background

Galvan joined the Department in December 2018. [31] ¶ 2. In September 2023, Galvan was transferred to Unit 214 in Area 4 of the 11th Police District. *Id.* ¶ 19. Shortly after Galvan's arrival, two other female officers in Unit 214 had a verbal altercation significant enough that defendant Deputy Chief Adnardo Gutierrez convened a meeting with certain 11th District employees—including Galvan—to discuss the incident.[1] *Id.* ¶¶ 20–21.

Gutierrez asked meeting participants their opinions regarding the incident, in particular about "the ongoing issues involving female patrol officers working for Unit 214 and the 11th District." *Id.* ¶ 23. (The complaint does not explain the nature of these issues.) Gutierrez asked Galvan her opinion, and she responded: "I do not have problem with either side and [] I look forward to working with everyone" and "I'm not exactly sure what is going on but [] maybe it was some miscommunication." *Id.* ¶ 24.

---

[1] The operative complaint does not relate the cause of the verbal altercation, but the Court does not understand that to be relevant to evaluating Galvan's claims.

Galvan says that she was then "ostracized for failing to side with either of the two officers involved in the verbal altercation – where the verbal altercation involved ongoing issues between female patrol officers working for Unit 214 and the 11th District." *Id.* ¶ 25. This ostracization included nondefendant Officer Ramona Robles declining to train Galvan in timekeeping in October 2024 because Robles did not want Galvan "in [her] shit." *Id.* ¶ 26. Similarly, in late October or early November of 2023, Officer Gladys De Leon—one of the officers involved in the verbal altercation, but also a nondefendant in this action—"walked up to [Galvan] in a physically threatening manner and slammed papers on [Galvan's] desk," causing Galvan to believe De Leon intended to strike her. *Id.* ¶¶ 28–29. When Galvan related this mistreatment to Gutierrez, Gutierrez told Galvan she was "'soft for letting a bunch of girls get to her'" and, as Galvan characterizes his statements, "indicated that she needed to act *more like a man*." *Id.* ¶ 32 (emphasis in original).[2] Gutierrez did not reprimand any of the employees who mistreated Galvan. *Id.*

The apparent ostracization continued after Galvan's report to Gutierrez. In December 2023, Galvan was informed that an Officer Sylvia Rodriguez would be observing Galvan at work, seemingly full time. *Id.* ¶¶ 33–34. And that same month Robles "sarcastically asked Plaintiff [if] she wanted to work for Commander Davina Ward," which confused Galvan. *Id.* ¶¶ 35–36. The resulting work-related stress led

---

[2] It is not clear whether Gutierrez actually used the words "act more like a man" or whether these words simply reflect Galvan's understanding of Gutierrez's comments. In her complaint, Galvan places quotation marks around the word "soft" when she describes Gutierrez's comments. *E.g.*, ¶¶ 32, 51, 66, 73, 78. Galvan does not do the same with the phrase "act like a man." Whether Gutierrez actually used the words "act like a man," though, does not affect the Court's resolution of defendants' motion.

Galvan to experience anxiety, sleep issues, and weight loss. *Id.* ¶¶ 37–38. By January 3, 2024, the circumstances were bad enough that Galvan requested a transfer from Unit 214, though Galvan identified a long commute time and childcare as her reasons for the transfer request. *Id.* ¶ 39. While these were legitimate concerns for Galvan, she was "too afraid to identify the other reasons she wanted a transfer," which were "that she felt ostracized and harassed by other police department employees after she refused to take sides relative to the verbal altercation." *Id.* ¶¶ 40–42.

On January 13, 2024, Robles again confronted Galvan and expressed dissatisfaction at Galvan's decision to remain neutral. *Id.* ¶ 43. Robles then informed Galvan that Robles had told Gutierrez that Galvan "gotta go," meaning she Robles wanted Galvan transferred to another unit. *Id.* ¶ 44. During the same conversation Robles told Galvan that Gutierrez had said that "maybe this will teach Galvan who[se] side her loyalty is with." *Id.* ¶ 45. De Leon overheard the exchange with Robles and told Galvan that "[i]f you're neutral, you're against us" and that she was surprised that Galvan "had lasted this long." *Id.* ¶¶ 47–48. De Leon also asked Galvan if she was "going to quit."[3] *Id.* ¶ 49.

On January 23, 2024, Galvan met with defendant Sergeant James Kurth[4] to report her feelings of ostracization stemming from her neutrality after the verbal altercation. *Id.* ¶¶ 52–53. Galvan later had similar conversations with Gutierrez and

---

[3] Galvan also says that she started looking for a different position at a different unit "as a result of" the mid-January 2024 conversations, though does not explain how this fits with her allegation that she submitted transfer paperwork on January 3, 2024. [31] ¶ 50.

[4] This portion of the complaint refers to "Sergeant James Furth" but the Court understands this to be a scrivener's error.

nondefendant Lieutenant Nicholas Duckhorn, explaining that she was being harassed and ostracized due to her neutrality in the verbal dispute. *Id.* ¶¶ 54–55. In her meeting with Gutierrez, Galvan further related her January 13, 2024 conversations with Robles and De Leon. *Id.* ¶ 56. Gutierrez "downplayed [Galvan's] concerns and sarcastically stated that this is just what happens in an all women environment and that [Galvan] should get used to it," and asked Galvan if she was "going to let them win?" *Id.* ¶¶ 57–58. Gutierrez also told Galvan he was disappointed that Galvan allowed Robles and De Leon to "get to" her. *Id.* ¶ 60. Galvan then asked Gutierrez if she could transfer to the 7th District to get away from the harassment, which Gutierrez agreed to. *Id.* ¶¶ 61–62.

Galvan prepared a letter documenting her transfer request, which Gutierrez signed. *Id.* ¶¶ 63–64. Despite granting the request, Gutierrez called a staff meeting on January 25, 2024, where "he told everyone in attendance that Galvan's complaint about harassment and being ostracized as a result of her taking a neutral position regarding the incident between Officers Robles and De Leon should never have been brought to his attention." *Id.* ¶ 65. Gutierrez then rescinded Galvan's request to transfer to the 7th District and called her "soft" for seeking the reassignment, which Galvan understood to imply that she was being "soft" because she was a woman. *Id.* ¶ 66. De Leon realized that Galvan had reported her to Gutierrez and began yelling at Galvan, while Gutierrez walked away. *Id.* ¶ 68. Sergeant Kurth then instructed Galvan, De Leon, Robles, and another officer to discuss the situation in another room,

where Robles and De Leon denied making threatening statements to Galvan. *Id.* ¶¶ 69–70.

After the meeting with Kurth, Galvan was asked to visit Gutierrez. *Id.* ¶ 71. When Galvan arrived at his office, Gutierrez "yelled at her for signing his name to the cover letter that [Galvan] prepared in conjunction with the [transfer] approval letter that Deputy Chief Gutierrez had actually signed with his own hand." *Id.* Galvan was surprised by Gutierrez's reaction "because it was commonplace for her department and unit to sign certain documents on behalf of superiors" with the superior's authorization, and Galvan "merely signed Deputy Chief Gutierrez's name on a cover letter with his permission – *after* Deputy Chief Gutierrez had already signed the transfer letter." *Id.* ¶ 72. During this same exchange, Gutierrez said several times that Galvan was "soft for letting the girls get to you" and that her complaints about harassment and ostracization should not have reached him. *Id.* ¶¶ 73–74. Gutierrez also told Galvan that he was rescinding her transfer to the 7th District. *Id.* ¶ 75.

Galvan then requested a transfer to the 3rd District, even though this "would cause her to lose her administrative position and possibly return to patrol work in a high-crime area." *Id.* ¶ 77. Gutierrez agreed to the transfer to the 3rd District, though again told Galvan that she had been "soft for letting a bunch of girls get to her" and "indicated that she needed to act *more like a man*." *Id.* ¶ 78 (emphasis in original).[5]

---

[5] Again, it is not clear whether Gutierrez actually used the words "more like a man" or whether these words simply reflect Galvan's understanding of Gutierrez's comments. *See supra* footnote 2.

6

Galvan believes that Gutierrez "expected [Galvan] to argue and verbally push back at her tormentors – as is a normal occurrence among male police officers." *Id.*

Galvan subsequently filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), on February 7, 2024, *id.* ¶ 16, or January 25, 2024, *id.* ¶ 79. In either case, Galvan acknowledged that she "digitally signed" the EEOC charge on February 7, 2024, and emailed defendant Sergeant Anthony Strazzante a document reflecting the charge on February 15, 2024. *Id.* ¶¶ 94–95.

In the meantime, Galvan returned to the 3rd District on February 1, 2024. *Id.* ¶ 82. While Galvan had requested the transfer, her hours were also changed. Instead of the second watch, which she had understood she would keep when she had been slated to transfer to the 7th District, she was now assigned to the third watch, which Galvan understood to be "form of punishment for complaining about how other officers in her prior unit had been ostracizing and harassing her." *Id.* ¶¶ 80–81. The third watch (1 p.m. to 10:30 p.m.) is considered a less desirable assignment than the second watch (6 a.m. or 7 a.m. to 2:30 p.m. or 3:30 p.m.). *Id.* ¶ 83. In addition to making it more difficult for Galvan to see her young child, the third watch "is also a more dangerous timeslot given that [it] takes place during the evening hours." *Id.* ¶ 85. (Galvan does not explain the nature of the danger; she also does not state whether she returned to patrol work upon her transfer.) Galvan alleges that defendant "Commander Melvin Branch and/or Defendant Sgt. James Kurth (at the direction of Deputy Chief Gutierrez or someone designated by him)" made the watch

assignment "in retaliation for [Galvan] complaining about sex discrimination." *Id.* ¶ 81.

At some point in January 2024—Galvan does not say when—Kurth and Gutierrez initiated an Internal Affairs investigation into Galvan's initial transfer paperwork. *Id.* ¶ 87. Galvan alleges the investigation was "bogus" and based on a false claim that she had forged Gutierrez's signature without his permission to do so. *Id.* Galvan contends that she did in fact have permission to sign on Gutierrez's behalf. *Id.* ¶ 88. On February 2, 2024—after her transfer to the 3rd District—Galvan filed a departmental complaint about the mistreatment she had suffered from Gutierrez and others. *Id.* ¶ 92. She opened another departmental complaint on February 7, 2024, regarding her assignment to the third watch. *Id.* ¶ 93.

On March 7, 2024, Strazzante initiated an investigation to determine if Galvan had filed her department complaints in retaliation for the forgery investigation. *Id.* ¶ 97. Galvan alleges this new investigation was also "bogus" and itself retaliatory. *Id.* On March 8, 2024, Strazzante interviewed Galvan in regard to her complaint about the third watch assignment. *Id.* ¶ 96. At this point Strazzante knew of the EEOC charge. *Id.* Strazzante interviewed Galvan again on May 21, 2024, where he accused her of destroying an email related to his earlier investigation. *Id.* ¶ 98. Galvan denies destroying any relevant emails and alleges Strazzante made the accusation "out of spite after he had learned of the filing of Plaintiff's EEOC charge." *Id.* ¶¶ 98–100.

8

Galvan sued the City, Gutierrez, Strazzante, Kurth, and Branch on March 10, 2024. [1]. On July 23, 2024, Galvan was "stripped of her police powers" and surrendered her handgun, badge, and police hat. *Id.* ¶ 101. Defendants' given reason for this action was Galvan's alleged forgery of Gutierrez's signature, but Galvan alleges this explanation was "totally false and pretextual" and she was actually stripped of her police powers because of her departmental complaints, EEOC charge, and the instant lawsuit. *Id.*

In her operative complaint, Galvan alleges that her treatment at Unit 214 and during the subsequent transfer constitute sex and/or gender discrimination under Title VII and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, and that the City has engaged in a widespread pattern and practice of sex discrimination against female officers. *Id.* ¶¶ 127–128, 140–143, 151–160; *see Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Galvan further claims that she was retaliated against for reporting her harassment and ostracization to Department leadership and filing her EEOC complaint, and that such retaliation is also a widespread pattern and practice within the Department. *Id.* ¶¶ 130–138; 145–46; 148–49. Finally, Galvan claims that the forgery investigation against her violated the Illinois Whistle Blower Act and Illinois defamation law. *Id.* ¶¶ 161–179. Defendants move to dismiss all counts. [39], [40].

## III. Analysis

### A. Sex Discrimination

Galvan's claims of discrimination under Title VII and § 1983 are evaluated under the same standard. *See Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1007

(7th Cir. 2018). To prove her claim under either theory, Galvan "must present sufficient evidence that she was a member of a protected class, she performed reasonably on the job in line with the employer's legitimate expectations, she was subjected to an adverse employment action, and similarly situated employees of the opposite sex were treated more favorably." *Lauderdale v. Illinois Dep't of Hum. Servs.*, 876 F.3d 904, 910 (7th Cir. 2017).

Galvan's discrimination claims run aground at the latter two requirements. An adverse employment action involves "some harm respecting an identifiable term or condition of employment." *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1337 (7th Cir. 2024) (*quoting Muldrow v. St. Louis*, 601 U.S. 346, 355 (2024). To meet this element, Galvan relies on Gutierrez's comments that Galvan was "soft for letting a bunch of girls get to her" and Galvan's transition to the third watch. [48] at 9–12.

Galvan argues that "Gutierrez's comments were discriminatory in nature – where he was treating [Galvan] *differently* because of her gender and the manner in which she responded to her tormentors." [48] at 10 (emphasis in original). But different treatment is not by itself "harm respecting an identifiable term or condition of employment." *Thomas*, 120 F.4th at 1337. As the Supreme Court wrote in *Muldrow*, 601 U.S. at 355: "'Discriminate against' means treat worse, here based on sex." Although Galvan alleges she was treated poorly by Gutierrez, she does not actually allege that she was "treat[ed] worse" by him, relative to how Gutierrez treated any other officer. *Id.*

10

Galvan relies on *Petrosino v. Bell Atl.*, 385 F.3d 210, 224 (2nd Cir. 2004), and *Sebold v. City of Middletown*, No. CIV. 305-CV-1205 AHN, 2007 WL 2782527 (D. Conn. Sept. 21, 2007), to support the contention that Gutierrez's comments were a materially adverse change in her employment conditions, but neither case helps. For one thing, both cases involve hostile workplace claims, and in responding to defendants' motion to dismiss, Galvan makes no argument that Gutierrez's conduct was "severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment." *See Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018). Galvan has thus waived, or at least forfeited, any hostile workplace theory. *See Hernandez v. Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established in our precedents that 'skeletal' arguments may be properly treated as waived.").[6]

Further, the conduct at issue in both *Petrosino* and *Sebold* was substantially worse than that described by Galvan. *See, e.g.*, *Petrosino*, 385 F.3d at 224 (plaintiff's sexual assault by male coworker subject of office jokes and graffiti); *Sebold*, 2007 WL 2782527, at *11 (female plaintiff alleged supervisor "publicly belittled her, retaliated against her with baseless discipline, physically intimidated her, and falsely accused

---

[6] Galvan seeks to rely on *Robinson v. City of Chicago, et al.*, 24 CV 3329, Dkt. 42 (N.D. Ill. Feb. 19, 2025), which she submitted as supplemental authority, well after she filed her initial response to defendants' motion to dismiss. [62]. In *Robinson*, however, the plaintiff squarely teed up and addressed a hostile work environment claim—both in her complaint and in her original response to defendants' motion to dismiss. *See, e.g.*, 24 CV 3329, Dkt. [1] ¶ 12 (alleging that defendants "discriminated against Robinson by creating a hostile work environment"); *id.* ¶ 13 (likening "[t]he work environment at the Chicago Police Department" to "an old boys club" and "a fraternity house"); *see also id.* ¶¶ 17–18; 24 CV 3329, Dkt. 25 at 3–6.

her of leaking information in a manner that caused her to have an anxiety attack …
his hostility … continued for more than three years."). Although the Seventh Circuit
has cautioned that it can be "premature at the pleadings stage to conclude just how
abusive [a] work environment was," *see Huri v. Office of the Chief Judge of the Circuit
Court of Cook County*, 804 F.3d 826, 834 (7th Cir. 2015), a plaintiff's allegations must
still plausibly rise to the level of a hostile work environment. In *Huri*, plaintiff's
allegations of anti-Muslim, anti-Arab discrimination by her employer passed muster
where she pointed to "screaming, [Christian] prayer circles, social shunning, implicit
criticism of non-Christians, and uniquely bad treatment of Huri and her daughter,"
including prohibiting plaintiff Huri's daughter from waiting for plaintiff in the lobby
unlike the treatment of non-Arab, non-Muslim children of Huri's co-workers. *Id.* at
830, 834. *See also, e.g., Robinson v. City of Chicago, et al.*, 24-cv-3329, Dkt. 42 (Feb.
19, 2025), at 1 ("'Plaintiff alleges that Defendants created a hostile work environment
by tolerating a wide range of inappropriate behavior, including men leering at and
undressing in front of women, making derogatory and inappropriate comments about
women, and in one instance aggressively grabbing Plaintiff's arm.").

Galvan's allegations regarding Gutierrez's statements that she was "soft"
suffer by comparison. *See, e.g., Garrick v. Moody Bible Inst.*, 494 F. Supp. 3d 570, 579
(N.D. Ill. 2020) (plaintiff's allegations that coworkers ridiculed her and disparaged
her intelligence and clothes insufficient to state hostile work environment claim, even
if the comments were "undoubtedly callous, ignorant, and unpleasant"); *Adam v.
Obama for Am.*, 210 F. Supp. 3d 979, 991 (N.D. Ill. 2016) (alleged racial harassment

against intern, including exclusion from group activities, being laughed at, having hair pulled, and skin touching, insufficient). "[O]ccasional vulgar language, and coarse, rude, or boorish behavior will not amount to a hostile work environment" unless the behavior is "so pervasive or severe as to interfere with an employee's work performance," something Galvan does not allege. *Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022). Galvan has therefore not pleaded facts that would allow the Court to reasonably infer that Gutierrez's statements were an adverse employment action.

To support the argument that her transfer to the third watch was an adverse action, Galvan cites *Spalding v. City of Chicago*, 24 F. Supp. 3d 765 (N.D. Ill. 2014). [48] at 11. But *Spalding* involved a First Amendment retaliation claim and thus applied a different legal standard: whether the plaintiff suffered "a deprivation likely to deter free speech." 24 F. Supp. 3d at 775 (quoting *Peele v. Burch*, 722 F.3d 956, 959 (7th Cir.2013)). Further, the *Spalding* defendants conceded that element, so it was not addressed by the court. *Id.*

After *Muldrow*, courts no longer consider whether the alleged harm meets some threshold of materiality or severity, but merely whether there was "some harm." *See Thomas*, 120 F.4th at 1336–37 ("Decisions requiring allegations of "significant" or "material" injury did not survive *Muldrow*"). Here, Galvan alleges that the shift change makes her job more dangerous and makes it more difficult to see her young child. This is sufficient to establish an adverse action under *Muldrow. See id.* at 1337 ("[I]nability to care for a child is a deeply felt loss for all parents.").

13

But Galvan's complaint still does not establish that "similarly situated employees of the opposite sex were treated more favorably." *Lauderdale*, 876 F.3d at 910. For example, Galvan alleges Gutierrez treated her "worse than similarly situated male police officers who have been dragged into office-politics where Deputy Chief Gutierrez expected [Galvan] to argue and verbally push back at her tormentors – as is a normal occurrence among male police officers." [31] ¶ 78. But Galvan does not identify any male officers who received better treatment than she did, and the Court need not accept "threadbare recitals" supported by "mere conclusory statements." *Iqbal*, 556 U.S. at 678. Even setting that issue aside, Galvan's complaint does not permit the Court to reasonably infer that Guitierrez had different behavioral expectations of female officers than male officers. If Gutierrez expected Galvan to not be "soft" and to behave more "like a man," then presumably that was also his expectation for male officers. Such an expectation might be antiquated and sexist (across the board), but it would not be discriminatory. Put another way: There is nothing in the complaint that would allow the Court to infer that a similarly situated male officer who was "letting a bunch of girls get to [him]," [31] ¶ 78, would have been given a more favorable assignment.

Galvan thus has not pleaded facts that would allow the inference that any adverse action she experienced was on the basis of her sex and has thus not sufficiently alleged discrimination under either Title VII or the Fourteenth Amendment.

### B.     Retaliation

Galvan also brings claims of retaliation under Title VII. For a Title VII retaliation claim, Galvan must show that "(1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two." *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019) (cleaned up). "Protected activity" is "some step in opposition to a form of discrimination that the statute prohibits." *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 501 (7th Cir. 2017). The "key question" in establishing the third element, causation, is "whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action." *Rozumalski*, 937 F.3d at 924 (citing *Ortiz v. Werner Enterprises Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016)).

Galvan identifies three protected activities: filing her EEOC charge on February 7, 2024; filing her departmental complaints on February 2 and February 7, 2024; and filing this lawsuit. [48] at 12–13. While the EEOC charge and this lawsuit are undoubtedly protected activities for the purpose of Title VII, *see Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014), it is not clear from the face of the complaint that the departmental complaints involved "opposition to a form of discrimination [Title VII] prohibits." *Ferrill*, 860 F.3d at 501. The February 2 complaint is described as "document[ing] the mistreatment [Galvan] has suffered at the direction of Deputy Chief Adnardo Gutierrez and others." [31] ¶ 92. The February 7 complaint "document[ed] [Galvan] being assigned to the third watch, as a result of her complaining about how Deputy Chief Gutierrez, Sgt. Anthony R. Strazzante and

15

Sgt. Kurth had retaliated against her." *Id.* ¶ 93. But, as discussed above, Galvan has not alleged facts that would allow the Court to conclude the alleged mistreatment underlying the complaints was on the basis of sex. Galvan has therefore not sufficiently alleged that these departmental complaints are protected activity for the purpose of Title VII.

Galvan's complaint also fails to causally connect the EEOC charge or lawsuit to any adverse action. For one thing, even if the Court concludes the forgery investigation and Galvan's transfer and new schedule constitute adverse actions—an issue the Court does not reach—the forgery investigation began in January 2024, and Galvan's transfer and new schedule came on February 1, 2024, before either the EEOC charge or this lawsuit.[7]  Galvan argues that the July 23, 2024 suspension of her police powers was an adverse employment action because she was then "disqualified for earning overtime opportunities, promotions, and bidding for other job openings," [31] ¶ 101. And, indeed, denial of overtime pay can constitute an adverse employment action. *See Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016). But Galvan alleges no facts that plausibly connect her July suspension to either the February EEOC charge or May lawsuit. Galvan asserts that the reason given for losing her police powers—that she forged Gutierrez's signature—was "totally false and pretextual." [31] ¶ 101. But the forgery investigation that resulted in the suspension started before either the EEOC charge or the lawsuit, so neither

---

[7] Neither the forgery investigation nor the new schedule could have been prompted by the departmental complaints either, the first of which was filed on February 2, 2024.

could have motivated the investigation. Galvan also gestures at a suspicious timing argument. [48] at 12. But while "suspicious timing" is the sort of circumstantial evidence that can potentially "supply the causal link," *Rozumalski,* 937 F.3d at 924 (cleaned up), the months-long gap between the protected activity and the suspension here does not by itself support an inference of retaliation, *see Harper v. C.R. England, Inc.*, 687 F.3d 297, 309 (7th Cir. 2012) ("[E]vidence regarding suspicious timing, without more, is generally insufficient to support a reasonable inference of retaliation.")*; see also Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (47-day gap between protected activity and adverse action did not allow inference of causation).

Finally, to the extent Galvan argues that defendants violated City or Department policy in retaliating against her, *see* [31] ¶¶ 103–15, these policy violations cannot independently provide the basis for a federal claim. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 380 (7th Cir. 2017) (en banc) ("Nothing in the U.S. Constitution required" state prison medical provider follow departmental policies).

### C. *Monell* Claims

Galvan also asserts *Monell* claims against the City for both sex discrimination and retaliation. [48] at 14–15. To succeed on *Monell* claims, Galvan "must ultimately prove three elements: (1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the "moving force" behind the constitutional injury." *Hall v.*

*City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020). To establish the existence of a municipal policy, Galvan must show that her "constitutional injury was caused by (1) the enforcement of an express policy, (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010).

But, as discussed above, Galvan has not alleged facts that allow an inference of any constitutional violation, so there is no basis for a *Monell* claim. *See Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010) ("[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee.").

Galvan's *Monell* theory runs into a second problem. Galvan does not allege any express policy. Instead, as defendants note, Galvan relies on two other ongoing lawsuits filed by female police officer in Chicago to establish that there is a widespread practice of discrimination and retaliation. [40] at 14–15; [31] ¶¶ 116–117. But "[a] lawsuit is an allegation. So pointing to other lawsuits simply establishes that other people have made accusations against" the City, not that any practice exists. *Arquero v. Dart*, 587 F. Supp. 3d 721, 730 (N.D. Ill. 2022). This is especially true when as here, there has been no finding of liability in the cases relied upon. *Livingston v. City of Chicago*, No. 16 C 10156, 2024 WL 245214, at *11 (N.D. Ill. Jan. 22, 2024).

Finally, Galvan has not alleged that any person "with final policymaking authority" was involved in the alleged constitutional violation. The complaint alleges

that Gutierrez "had final decision making authority to discipline and transfer [Galvan] and other police officers under his vast command." [31] ¶ 141. But the relevant question in a *Monell* claim is not who makes *decisions* but who makes *policy*; that is, who has authority to "adopt rules for the conduct of government." *Waters v. City of Chicago,* 580 F.3d 575, 582 (7th Cir. 2009). Identifying an official who merely has "authority to *implement* pre-existing rules" is not enough. *Id.* (cleaned up); *see also Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992) ("Authority to make a final decision need not imply authority to establish rules."). Galvan has pleaded no facts that allow the inference that Gutierrez or any other individual defendant had authority to make policy during the relevant period, and indeed the Seventh Circuit has found that even higher-ranking members of the Department are not final policymakers. *See, e.g., Auriemma*, 957 F.2d at 401 (Chicago police superintendent "had no power to countermand the statutes regulating the operation of the department" and was therefore not final policymaker). Galvan has thus not alleged facts that could support *Monell* liability under 42 U.S.C. § 1983.

### D.    Illinois Whistleblower Act and Defamation

Finally, Galvan brings state-law claims for defamation and under the Illinois Whistleblower Act. Because Galvan is a citizen of Illinois, the Court's jurisdiction over these state-law claims relies on the supplemental jurisdiction granted by 28 U.S.C. § 1367. [31] ¶¶ 1, 13. But, as discussed above, the Court dismisses all federal claims. And because the Court dismisses all claims over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over these remaining state-law claims. 28 U.S.C. § 1367(c)(3).

## IV.     Conclusion

For the foregoing reasons, defendants' motion to dismiss [39] is granted. Galvan's complaint is dismissed without prejudice.

Galvan may refile an amended complaint if she can cure the deficiencies identified above while still complying with her obligations under Federal Rule of Civil Procedure 11. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015) ("Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss."). Any amended complaint is due on or before 7/22/25. If plaintiff does not submit an amended complaint by 7/22/25, the dismissal will automatically convert to a dismissal with prejudice, and the case will be terminated.

Georgia N. Alexakis
United States District Judge

Date: 7/1/25

20